IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

02 JUN 17 PM 2:42

U.S. DISTRICT COURT
N.D. OF ALABAMA

JANICE EASON, as Administratrix )
of the Estate of WALLACE )
MITCHELL, DECEASED )
    Plaintiff, )
     )
v. )          CV-00-H-0969-NE
     )
CITY OF HUNTSVILLE, et al., )
     )
    Defendant. )

ENTERED

JUN 17 2002

## MEMORANDUM OF DECISION

The Court has before it the five separate March 1, 2002 motions by Defendant Officers John Hollingsworth, Kathy Ingram[1] and Chet Williams, Defendant City of Huntsville, and Defendant Huntsville Police Chief Compton Owens for summary judgment. Pursuant to this Court's March 6, 2002 order, the Defendants' motions were deemed submitted, without oral argument, on April 2, 2002.

### I. PROCEDURAL HISTORY

Plaintiff Janice Eason commenced this action on April 4, 2000 by filing a complaint pursuant to 42 U.S.C. §§ 1983 and 1998 alleging violations of decedent's First, Fourth, Fifth and

---

[1] Officer Kathy Ingram was referred to in the Complaint as "Cathy Vaughn." (See Compl. ¶¶ 1, 20.) The Court assumes that this was simply harmless error, as both Plaintiff and Defendants refer to "Kathy Ingram" in documents thereafter. The Complaint is amended to substitute "Kathy Ingram" for "Cathy Vaughn."

51

Fourteenth Amendments.[2] (See Compl. ¶¶ 1, 16-23.) Plaintiff sued Defendant Officers John Hollingsworth, Cathy Vaughn and Chet Williams, and Defendant Huntsville Police Chief Compton Owens in both their official and individual capacities. Pursuant to this Court's June 8, 2000 order, those defendants were dismissed to the sole extent that the Complaint stated or purported to state a claim against them in an official capacity. Under this Court's June 26, 2000 order, the deadline for discovery was fixed as May 1, 2001 and the deadline for dispositive motions at June 1, 2001. Defendants' motions for summary judgment generally assert that no genuine issue or material fact exists and that they are each entitled to judgment as a matter of law. The motion filed by Officers Hollingsworth, Ingram and Williams and Police Chief Owens additionally assert qualified immunity.

On March 12, 2002, Defendants jointly submitted evidence[3] in

---

[2] Under this Court's supplemental jurisdiction, the complaint included an Alabama Wrongful Death Act claim against the City of Huntsville. (See Compl. ¶¶ 24-26.) Even though the motion under submission also seeks summary judgment as to that state law claim, this Memorandum of Decision is limited to the federal question § 1983 claims.

[3] Defendants submitted two volumes of evidence. Volume I included the deposition testimony of: (1) Chet Williams; (2) Kathy Ingram; (3) John Hollingsworth; (4) Janice Eason; (5) Annie Sue Horton; (6) Danny Hyter; (7) Jessica Horton; (8) Juana Horton; (9) Dorothy C. Sanders; (10) Carolyn Palmer-Tesema; (11) Angelia Nickels; (12) Johnny Jones; and (13) Fred G. Robinette, III. Volume II contained the affidavits of: (1) Chet Williams; (2) Kathy Ingram; (3) John Hollingsworth; (4) Compton C. Owens; (5) Edward W. Nixon; (6) Lewis E. Morris; (7) Ray Tielking; (8) Randall B. Tichenor; (9) Lisa S. Hamilton; (10) Kirk Giles; (11)

support of their motions and filed accompanying briefs on March 19, 2002.[4] Plaintiff filed a brief in opposition to defendants' motions for summary judgment on April 2, 2002. Plaintiff submitted no evidence in opposition to the motion but referred to portions of the evidentiary submissions of Defendants in her brief in opposition to the motions.

## II.   STANDARDS FOR EVALUATING A SUMMARY JUDGMENT MOTION

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322

---

Winnie L. Bailey; (12) Timothy E. Barnes; (13) Martin L. Fackler; (14) Robert Beasley, Jr.; and (15) James Creel; Volume II also contained certified copies of: (1) the Alabama Uniform Incident/Offense Reports detailing the incidents reported to Huntsville Police Department by Annie Sue Horton on September 9, 1996, April 23, 1997, October 4, 1997, December 16, 1997, March 3, 1998, March 18, 1998 and April 17, 1998; (2)two Complaints by Annie Sue Horton against Wallace Mitchell and their related Arrest Warrants for Wallace Mitchell dated December 17, 1997 and March 30, 1998; and (3) a Witness Statement by Annie Sue Horton detailing an incident on April 17, 1998. It further contained: (1) a report of autopsy prepared by Dr. Stephen Pustilnik; (2)Defendant's First Request for Admissions to Plaintiff, served July 25, 2000; (3) a report prepared by Fred G. Robinette, III; and (4) two site maps of 5014 Blue Spring Road.

[4] Defendant Officers Williams, Hollingsworth and Kathy Ingram, who the Court assumes is the Cathy Vaughn listed in the Complaint, filed a brief collectively, and Defendants City of Huntsville and Huntsville Police Chief Owens filed jointly.

-3-

(1986); <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  <u>See</u> <u>Celotex</u>, 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  <u>See</u> <u>id</u>. at 324.

The substantive law will identify which facts are material and which are irrelevant.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Chapman</u>, 229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor the non-movant.  <u>See</u> <u>Chapman</u>, 229 F.3d at 1023; <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248; <u>Chapman</u>, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>See</u> <u>Anderson</u>, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears

the burden of proof on the issue at trial.  See Fitzpatrick, 2
F.3d at 1115-17 (citing United States v. Four Parcels of Real
Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the
moving party bears the burden of proof at trial, then it can only
meet its initial burden on summary judgment by coming forward
with positive evidence demonstrating the absence of a genuine
issue of material fact; i.e. facts that would entitle it to a
directed verdict if not controverted at trial.  See Fitzpatrick,
2 F.3d at 1115.  Once the moving party makes such a showing, the
burden shifts to the non-moving party to produce significant,
probative evidence demonstrating a genuine issue for trial.

     If the moving party does not bear the burden of proof at
trial, it can satisfy its initial burden on summary judgment in
either of two ways.  First, the moving party may produce
affirmative evidence negating a material fact, thus demonstrating
that the non-moving party will be unable to prove its case at
trial.  Once the moving party satisfies its burden using this
method, the non-moving party must respond with positive evidence
sufficient to resist a motion for directed verdict at trial.

     The second method by which the moving party who does not
bear the burden of proof at trial can satisfy its initial burden
on summary judgment is to affirmatively show the absence of
evidence in the record to support a judgment for the non-moving
party on the issue in question.  This method requires more than a

simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III.   RELEVANT UNDISPUTED FACTS

In this case, Plaintiff has incorporated by reference the majority of the relevant, undisputed facts set forth in the brief in support of motions for summary judgment of Defendant Officers Williams, Ingram and Hollingsworth. (See Brief in Opposition to Briefs in Support of Defendants' Motions for Summary Judgment 1.) Defendants City of Huntsville and Police Chief Owens also have adopted as a portion of their factual presentation the entire

-6-

statement of facts set forth in the brief of Officers
Hollingsworth, Ingram and Williams. (See Br. in Supp. of Mots.
for Summ. J. of City of Huntsville and Huntsville Police Chief
Compton Owens 2.) Rather than summarize those facts, the Court
will simply set forth the facts presented in the Defendant
Officers' brief, omitting the references to the record contained
therein. Where those facts are set out in the brief in a
footnote, the footnote will be brought into the text in a
bracket, preceded by "FN:[#]". Facts in dispute or arguably in
dispute will be appropriately noted by the Court in a footnote.
Supplemental relevant facts supplied by Defendants to which
Plaintiff expressly calls the Court's attention also will be
noted by the Court in a footnote. Except where expressly stated
to the contrary by the Court, the following facts set out in the
Defendant Officers' brief are undisputed:

> On the morning of April 17, 1998, Wallace Mitchell
> was visiting his girlfriend, Annie Horton, at her house
> located at 5004 Ortega Circle in Huntsville, Alabama.
> [FN2: It is unclear whether Wallace Mitchell spent the
> night at Annie Horton's house on the evening before
> April 17, 1998. Plaintiff, who is Wallace Mitchell's
> sister, testified that he spent the night of April 16,
> 1998, at her house and that he went to Annie Horton's
> house during the early morning hours of April 17, 1998.
> Annie Horton, however, testified that Wallace Mitchell
> arrived at her house at approximately 9:00 p.m., on
> April 16, 1998, that he slept the entire night with her
> in the same bedroom, and that he was at her house when
> she awoke around 7:30 a.m., or 8:00 a.m., on morning of
> April 17, 1998.] At some point after Annie Horton awoke
> that morning around 7:30 a.m., or 8:30 a.m., she and
> Mitchell had a "misunderstanding" and were arguing with
> one another. The argument stemmed from the fact that

Mitchell was "upset" because Annie Horton had spent the previous day at her mother's house and was planning to go there again for the day even though he had the day off from work and wanted her to stay at home with him. During the argument, Mitchell was "fussin" loudly and "hollering" at Annie Horton, telling her at one point that she was not going anywhere "over his dead body," and was walking around the house holding a gun.[FN3: Annie Horton testified that she had seen this same gun before this occasion because Mitchell carried it with him "all the time." Also, plaintiff testified that Mitchell had this same gun with him on the night before the shooting incident when he was at her house.] According to Annie Horton, Mitchell's gun was black with black tape wrapped around the grips. Some of Annie Horton's young children, Juanna, Jessica, Felicha, and Ortavis were present at the house at this time.

While Mitchell and Annie Horton were arguing, one of Annie Horton's daughters, Juanna Horton, left the house and walked to a nearby convenience store to call her brother, Danny Hyter, from a pay phone. When Juanna Horton called Danny Hyter,[FN4: Danny Hyter was at his grandmother's house at 4814 Shawmont Drive when he received this call.] she told him that her mother and Mitchell were "at home fussing" and that "Wallace Mitchell was sitting on the steps with a gun and he was holding them hostage." Juanna Horton also told Danny Hyter to call the police because she wanted them to "come up an stop [her mother and Mitchell] from fussing or make one of them leave so everything would be all right." After Danny Hyter hung up the telephone with his sister, he telephoned the police.

When Danny Hyter placed a "911" call to the police at approximately 9:40 a.m., the following exchange occurred between him and the 911 call-takers over the telephone:

| | |
|---|---|
| 911 Call Taker 1: | 911 - What's the location of your emergency? |
| Hyter: | Uh, could you send a police officer, over to Fifty-O-Four Ortega? |
| 911 Call Taker 1: | What's the address, sir? |

```
Hyter:                  Fifty-O-Four Ortega.
911 Call Taker 1:       Fifty-O-Four Ortega?
Hyter:                  Uh, uh.
911 Call Taker 1:       Okay, what's wrong
                        there, sir?
Hyter:                  Well, uh, I just, I
                        just, I received a
                        call from, uh, my
                        little sister. She
                        was saying, that uh,
                        my, uh, my mother's
                        friend's over there
                        clowning with her,
                        threatening her,
                        threatening to shoot
                        her or something.
911 Call Taker 1:       Ok. Do you know what
                        your sister's name
                        is?
Hyter:                  Tajuana.
911 Call Taker 1:       And her last name?
Hyter:                  Horton.
911 Call Taker 1:       Horton? [Pause] You
                        said that there's
                        somebody over
                        there's messing with
                        her?
Hyter:                  Uh, huh.
911 Call Taker 1:       Did she say who it
                        was?
Hyter:                  His name is, uh,
                        Quincy Wallace
                        Mitchell.
911 Call Taker 1:       Quincy Mitchell?
Hyter:                  Uh, huh.
911 Call Taker 1:       Did she say what he
                        was doing?
Hyter:                  She said he was over
                        there, uh,
                        threatening to shoot
                        them and -
911 Call Taker 1:       Do you know if he
                        has a gun?
Hyter:                  Uh, she didn't say.
911 Call Taker 1:       Do you know if, were
                        they going out or
                        something?
Hyter:                  Were they what?
```

-9-

```
911 Call Taker 1:    Said are they going?
                     Boyfriend,
                     girlfriend?
Hyter:               Oh, oh, they not,
                     well, yeah.
911 Call Taker 2:    Is he a friend or a
                     boyfriend?
Hyter:               [Clearing his
                     throat] He used to
                     be her boyfriend.
911 Call Taker 2:    Okay. Has he been
                     drinking?
Hyter:               Uh -
911 Call Taker 2:    Did she say?
Hyter:               I don't know.
911 Call Taker 2:    Okay, but he's there
                     now?
Hyter:               Uh, huh.
911 Call Taker 2:    Okay. So she does
                     know that you're
                     calling the police
                     for her?
Hyter:               Uh, no.
911 Call Taker 2:    Okay. Is your sister
                     at that house?
Hyter:               Uh, huh.
911 Call Taker 2:    Yes or no. I
                     couldn't understand
                     you.
Hyter:               Yes.
911 Call Taker 2:    She is? Okay. And
                     she does not know
                     you're calling the
                     police?
Hyter:               Uh, huh.
911 Call Taker 2:    Okay. Are you going
                     to call her back and
                     let her know?
Hyter:               Uh, huh.
911 Call Taker 2:    Okay. If you can,
                     can you call her
                     back? And ask her if
                     he's got any weapons
                     or anything of have
                     her, have her call
                     us at 911?
Hyter:               Okay.
911 Call Taker 2:    Okay. It is Fifty-O-
```

-10-

```
                         Four Ortega Circle?
Hyter:                   Uh, huh.
911 Call Taker 2:        Okay. And your
                         sister's name is
                         Tajuana?
Hyter:                   Uh, huh.
911 Call Taker 2:        Okay. All right.
                         We'll get the police
                         out.
Hyter:                   All right.
911 Call Taker 2:        Is that guy known to
                         carry a gun?
Hyter:                   Uh, well, the last
                         time, he had one.
911 Call Taker 2:        The last time he had
                         one?
Hyter:                   Uh, huh.
911 Call Taker 2:        Okay. When was -
Hyter:                   Because the pri-,
                         the uh, the private
                         investigator already
                         looking for him.
911 Call Taker 2:        Oh. What's he wanted
                         for?
Hyter:                   For, uh, uh, ugh,
                         dog. Well last time
                         he shot the car
                         window out and, and
                         uh-
911 Call Taker 2:        At this residence?
Hyter:                   Uh, huh.
911 Call Taker 2:        Okay. You said his
                         name was Quincy?
                         What was his middle
                         name?
Hyter:                   Wallace Mitchell.
911 Call Taker 2:        Quincy Wallace
                         Mitchell?
Hyter:                   Uh, huh.
911 Call Taker 2:        Do you happen to
                         know how old he is
                         or anything?
Hyter:                   He's thirty, uh,
                         three.
911 Call Taker 2:        Thirty-three years
                         old?
Hyter:                   Uh, huh.
911 Call Taker 2:        Okay, and black
```

```
                            male? White male?
Hyter:                      Black.
911 Call Taker 2:           Black male?
Hyter:                      Uh, huh.
911 Call Taker 2:           Okay. [Unclear] And
                            he, has he got
                            warrants out on him?
Hyter:                      Uh, huh.
911 Call Taker 2:           He does? And he is
                            in that house?
Hyter:                      Uh, huh.
911 Call Taker 2:           Okay. All rightie,
                            we'll get an officer
                            out, okay?
Hyter:                      All rightie, thank
                            you.
911 Call Taker 2:           All right. Bye, bye.
```

At approximately 9:42 a.m., immediately after the 911 call from Danny Horton ended, a dispatcher for the Huntsville Police Department ("HPD") advised over the radio that a domestic disturbance involving Mitchell and a female was in progress at 5004 Ortega Circle and that Mitchell reportedly had a gun. Officer Hollingsworth, who was riding in a patrol car with Officer Ingram, acknowledged the dispatcher's call and then both officers started heading toward 5004 Ortega Circle.[FN5: This was not the first time that Huntsville police officers had to respond to a domestic disturbance call involving Mitchell and Annie Horton. In fact, there had been at least six such incidents within the preceding two years.] While traveling, Officer Hollingsworth requested the dispatcher to send a third police officer to the scene. Officer Hollingsworth made this request because he had knowledge that one or more arrest warrants (one of which my have been for the felony offence of shooting into an occupied vehicle) were outstanding for Mitchell relating to a previous domestic violence incident,[FN6: In actuality, there were at least two misdemeanor arrest warrants outstanding for Mitchell, one for menacing and one for reckless endangerment, both of which were issued on the criminal complaints of Annie Horton.] because Mitchell was reportedly armed with a gun, and because he had knowledge that Mitchell had a tendency to run out the back door when the police arrived.[FN7: Officer Hollingsworth also had knowledge of previous domestic violence incidents involving

-12-

Mitchell and had heard that Mitchell had fought police officers in the past.]

As soon as the dispatcher's call went out over the radio advising of the domestic disturbance and reporting that Mitchell was armed with a gun, Officer Chet Williams, who was approximately five miles away from the scene at the time, heard the call and started driving his patrol car toward 5004 Ortega Circle. Officer Williams heard Officer Hollingsworth answer the call and request an assist unit. When the dispatcher requested an assist unit, Officer Williams advised over the radio at approximately 9:45 a.m., that he was already en route. As he was driving, Officer Williams also heard Officer Hollingsworth advise over the radio that Mitchell had a tendency to run out the back door when the police arrived.[5]

Officer Williams arrived at Annie Horton's house at 5004 Ortega Circle at approximately 9:50 a.m., at the same time Officer Ingram arrived in her patrol car. Officer Williams and Officer Ingram parked their respective patrol cars in front of the house situated next door to Annie Horton's house. After exiting their patrol cars, Officer Williams and Officer Ingram started approaching Annie Horton's house walking diagonally across the front yard. As they approached, Officer Ingram told Officer Williams that before turning on Ortega Circle she had let Officer Hollingsworth out of her patrol car on Winchester Road so that he could approach from the rear of Annie Horton's house on foot in case Mr. Mitchell tried to

---

[5] In his affidavit Officer Williams also states that he heard Officer Hollingsworth say over the radio that one or more outstanding arrest warrants existed for Mitchell relating to a previous domestic violence incident. (See Aff. of Officer Chet Williams ¶ 8.) Plaintiff states that such knowledge of warrants is an issue of fact, suggesting there is a discrepancy between ¶ 8 of Officer Williams' affidavit and page 14 of Williams' deposition testimony. (See Pl.'s Br. in Opp'n to Brs. in Supp. of Def.'s Mot. for Summ. J. 2.) No such discrepancy exists, however, because there is no evidence at the cited reference to Officer Williams' deposition disputing the affidavit statement of Officer Williams that he heard Officer Hollingsworth say over the radio that Mitchell had one or more outstanding warrants for previous domestic violence.

-13-

escape out the back of the house.

Officer Ingram walked up the porch steps to knock on the front door of Annie Horton's house while Officer Williams walked to the corner of the carport to keep an eye on the front and side doors fo the house. When Officer Williams saw Officer Hollingsworth reach his position in the back yard of Annie Horton's house, he started racing toward the front door to join Officer Ingram on the porch. As Officer Williams started to do so, a black female (later learned to be Annie Horton) holding a small child and two other children quickly exited the front door of the house.[FN8: Annie Horton had a "terrified look on her face" when she exited the front door.] Officer Ingram attempted to stop Annie Horton on the front porch, but she ignored her and continued walking past her and Officer Williams into the front yard with the children close at hand. As they were passing, Officer Ingram asked Annie Horton whether she had called the police and what was going on. Annie Horton responded, "He's at it again"; "This has got to stop." Officer Ingram also asked Annie Horton, "Is he still here?" Annie Horton responded, "Yes."[6]

After Annie Horton and the children exited the house, a black male (later learned to be Mitchell) leaned halfway out the front door of the house. All that could be seen was Mitchell's face and a portion of his left side. Officer [Williams] turned his attention toward Mitchell while Officer Ingram attempted to get information from Annie Horton in the front yard. Officer Williams walked up the first step of the front porch about three of four feet away from Mitchell and said, "Partner, show me your hands." Mitchell said, "What?" Officer Williams repeated, "Show me your hands," but again Mitchell only said, "What?" Officer Williams overheard Officer Ingram ask Annie Horton if Mitchell had a gun. When Annie Horton did not respond to this question, Officer Williams reached down, unsnapped his holster, and instructed Mitchell a third time, "Show me your hands."[FN9: Annie Horton testified

---

[6] Plaintiff asserts that Annie Horton testified that when the officers approached, she merely informed them that she had not called them and did not need them, and that she stayed on the porch. (See Pl.'s Br. in Opp'n to Brs. in Supp. of Def.'s Mot. for Summ. J. 2; see also Dep. of Annie Horton at 126-27.)

that while Mitchell was standing in the doorway, he had one hand behind his back and was holding a gun. This was the same gun that Annie Horton had seen on a previous occasion and earlier that morning, which she described as being black with black taped wrapped around the grips.] Mitchell said, "Hey, hey, what's going on?" Suddenly, there was a lot of movement behind the front door, after which, Mitchell, still leaning halfway out the door, finally stuck both of his hands out for Officer Williams to see. Officer Williams calmly said to Mitchell, "That's all I wanted to see," to which Mitchell replied, "Okay." Officer Williams asked Mitchell, "Are you Quincy?" to which Mitchell replied, "Yes."

As Officer Williams took a step toward Mitchell heading up the front porch, Mitchell began to move back into the house. Officer Williams immediately said, "Hold up until we figure out what's going on here." Before Officer Williams could finish his sentence, however, Mitchell quickly retreated into the house and slammed the front door. Before Mitchell could get the door closed, Officer Williams was able to wedge his foot in the bottom of the doorway. Officer Williams attempted to push the door open, but Mitchell was on the other side pushing it against him. After Officer Williams pushed on the door two or three times, Mitchell finally let go of the door and took of running through the house.[7]

Officer Williams quickly entered the house and started running after Mitchell. Officer Ingram followed behind Officer Williams running through the house. [FN10:  While running through the house, Officer Ingram

---

[7]Annie Horton testified that as Mitchell ran out of the back of the house, she heard an officer say something like "I'm fixing to kick your fucking ass." (See Dep. of Annie Horton at 135.) This is corroborated by the testimony of a neighbor, Johnny Jones, who testified that when Mitchell left running, he heard an officer say something like "Come back here" or "Don't you run" and "I'm going to kick your ass." (See Dep. of Johnny Jones at 53.) Annie Horton later supplemented her version of this aspect of the flight from the house by saying, "Nigger, I'm fixing to kick your fucking ass." (See Dep. of Annie Horton at 143.) She did this after her attorney had explained to her what constitutes a racial slur. (See id. at 142-43.)

called to Officer Hollingsworth over her radio and advised that Mitchell was coming out the house toward him, stating: "He's coming, Holly." Moments later, Officer Ingram advised the dispatcher that a foot pursuit was in progress.] Officer Hollingsworth had moved from the back yard into the carport. Mitchell ran through the living room and into the kitchen, headed out the side door of the house onto the carport, and ran westward into the backyard heading toward the woods. Mitchell had his gun with him when he ran out of the house. When Mitchell exited the house, Officer Hollingsworth yelled at him, called him by name, and told him to stop and that he was under arrest.[8] When Mitchell failed to stop, Officer Hollingsworth began chasing him.

Officer Williams and Officer Ingram exited the house through the side door onto the carport, and started running after Mitchell as well, heading through the backyard toward the woods. Officer Williams was behind Officer Hollingsworth. Officer Ingram was behind Officer Williams.

After running approximately 20 to 25 yards into the woods, Officer Williams hollered out to Officer Hollingsworth, "Johnny, can you continue?" Officer Hollingsworth yelled back, "Yes." Officer Williams ran back to his patrol car on Ortega Circle, hoping that by driving he could head off Mitchell on the other side of the wooded area on Blue Spring Road. Officer Ingram likewise ran back to her patrol car for the same reason. Officer Hollingsworth continued chasing Mitchell through the woods on foot.[9] [FN11: While

---

[8] Plaintiff contests the statement that Mitchell was ever told he was under arrest <u>before Officers Williams and Ingram entered the house</u> and started the chase. (<u>See</u> Pl.'s Br. in Opp'n to Brs. in Supp. of Def.'s Mot. for Summ. J. 3.) While this is technically correct, there is evidence which is not disputed that Officer Hollingsworth, addressing Mitchell by his first name Quincy <u>as he went out the side door of the house</u>, told Mitchell "to stop, that he was under arrest." (<u>See</u> Dep. of Officer John Hollingsworth at 24.)

[9] Plaintiff maintains that no one <u>witnessed</u> Officer Williams and Ingram discontinuing the chase in order to return to their vehicles. (<u>See</u> Pl.'s Br. in Opp'n to Brs. in Supp. of Def.'s Mot.

chasing Mitchell, Officer Hollingsworth gave a
description of Mitchell over his radio, stating: "Red
striped shirt, red hat, about 5-8, 180 pounds." In
addition, Officer Hollingsworth reported the location
where he believed Mitchell would exit the woods: "Have
somebody go to Blue Springs where the apartment
complexes are. He should be coming out there."][10]

Once Officer Williams got back to his patrol car
and quickly turned it around, he sped northward on
Ortega Circle, turned left on Winchester Road heading
westward, and turned left on Blue Spring Road heading
southward. As Officer Williams approached the apartment
complex at 5130 Blue Spring Road, he spotted Mitchell
walking northward along the sidewalk in front of an
apartment complex heading in his direction.[FN12:
There are actually two sidewalks running parallel in
front of the apartment complex: one running between the
apartment complex and the parking lot, and one running
between the parking lot and Blue Spring Road. Mitchell
was walking along the former sidewalk.] Officer
Williams quickly pulled into the parking lot of the
apartment complex, turning left into the first
driveway. When Officer Williams' patrol car reached a
point approximately twenty feet from Mitchell, Mitchell
quickly turned around and started running again,

---

for Summ. J. 3.) The absence of any such witness is not material
and certainly does not rise to the level of disputing the sworn
testimony of Officer Williams, (see Aff. of Officer Chet Williams
¶¶ 11-12; see also Dep. of Officer Chet Williams at 26), or the
sworn testimony of Officer Ingram. (See Dep. of Kathy Ingram at
32-36.)

[10] Plaintiff refers to the deposition testimony of Carolyn
Palmer-Tesema which at times contradicts, or at least
supplements, the next twelve paragraphs from the Officers' brief.
One of the major contradictions is the location where the balance
of the activity occurred. Ms. Palmer-Tesema places that activity
in the northern half of the parking lot of an apartment complex
on Blue Spring Road, which is 120 to 150 feet north of Robert
Beasley's yard. Mr. Beasley, and defendants Williams, Ingram and
Hollingsworth all place that activity as occurring in Mr.
Beasley's side and front yard. With this understanding, the court
will simply set out in subsequent footnotes any material, factual
difference between what Ms. Palmer-Tesema relates and what the
others relate as to the activity itself.

-17-

heading southward along the sidewalk. Officer Williams
slammed on his brakes in the parking lot, jumped out of
his patrol car, and started chasing Mitchell on foot.

Mitchell ran to the end of the sidewalk in front
of the apartment complex into a grassy area on the
north side of a house located at 5014 Blue Springs Road
(later learned to be occupied by Robert Beasley).
Mitchell fled toward a chain link fence which ran
between the apartment complex and Mr. Beasley's house.
[FN13: Officer Williams assumed that Mitchell was going
to try to climb over the fence in an effort to escape.]
When Mitchell reached the fence, he slipped on the wet
grass in a ditch.[FN14: The ditch was approximately
three feet wide and one-and-a-half to two feet deep.
The ditch ran from east to west in a grassy area along
the north side of Mr. Beasley's property forming a
boundary line between Mr. Beasley's yard and the
parking lot of the apartment complex.] Mitchell fell on
his back, allowing Officer Williams to catch up with
him.[11]

As Mitchell was getting up out of the ditch,
Officer Williams grabbed the back of his shirt near his
right shoulder, at which point Mitchell turned around
and attempted to punch Officer Williams.[FN15:  At or
about this time, Officer Ingram arrived and parked her
patrol car in the parking lot of the apartment complex
near Officer William's patrol car. After exiting her
patrol car, Officer Ingram started running toward
Officer Williams and Mitchell. Officer Williams had no
idea, however, that Officer Ingram was approaching.]
Officer Williams stepped back, pulled out his O.C.
spray, and sprayed Mitchell in the face while yelling
at him, "Get on the ground, get on the ground!"
Mitchell did not comply and seemed completely
unaffected by the O.C. spray. Mitchell tried to run
away from Officer Williams again, heading westward a
few steps and then turning southward along the fence
line in Mr. Beasley's yard. When Officer Williams

---

[11] Ms. Palmer-Tesema first states that she did not know how
many police officers were behind Mitchell when she first saw him,
then states more than one, then states there were two male
officers and one female officer, and then states she does not
know whether she saw three officers. (See Dep. of Carolyn Palmer-
Tesema at 127-28.)

-18-

caught back up with Mitchell and grabbed the back of his shirt again, Mitchell spun around and tried to punch Officer Williams again. Officer Williams stepped back and sprayed Mitchell a second time in the face with O.C. spray, all the while continuing to yell at him, "Get on the ground, get on the ground!" However, Mitchell still refused to comply, and he still seemed completely unaffected by the O.C. spray. Instead, Mitchell was fighting with Officer Williams trying to keep him from gaining control. This struggle continued as Officer Williams and Mitchell moved southward along the fence line in Mr. Beasley's front yard.

Because the O.C. spray was not having any effect and Mitchell was not getting down on the ground as ordered, Officer Williams dropped his O.C. spray and pulled out his expandable baton. Officer Williams advanced toward Mitchell, pushed him up against the fence, and struck him three to four times in the left thigh trying to knock his legs out from under him.[12] While striking Mitchell, Officer Williams continually yelled, "Get on the ground, get on the ground!" Officer Williams was never able to physically take Mitchell to the ground, and Mitchell never got on the ground voluntarily. During this physical confrontation, Officer Williams and Mitchell continued moving southward along the fence line in Mr. Beasley's yard.

When Officer Williams and Mitchell reached a point near the end of the fence line at the corner of Mr. Beasley's house, Mitchell pushed away from Officer Williams and started backpedaling diagonally into the front yard. Officer Williams initially continued to pursue Mitchell. But as Mitchell was backing up into the front yard of Mr. Beasley's house, Officer Williams heard Mitchell threaten, "I've got something for ya."[13]

_____

[12] Plaintiff asserts that Mitchell, after being sprayed, was merely standing there blinking when Officer Williams struck him. (See Pl.'s Br. in Opp'n to Brs. in Supp. of Def.'s Mot. for Summ. J. 4.) It is important to note, however, that the spray was having no effect on Mitchell and that Mitchell was refusing to comply with Williams instructions to "get on the ground." (See Dep. of Officer Kathy Ingram at 40-42).

[13] In his affidavit and in his deposition, Officer Williams testifies that he heard Mitchell make the statement. (See Dep. of

At that point, Officer Williams saw Mitchell pull a gun from his right pants pocket and begin raising it to a shooting position.[14] Officer Williams took a few steps backwards, threw down his baton while stepping to the left, and quickly drew his pistol. Officer Williams immediately yelled, "Drop it!," and then fired one round at Mitchell with his 9mm semi-automatic pistol. [FN16: At the time the shot was fired, Officer Hollingsworth was on the north side of the apartment complex at 5130 Blue Spring Road, approximately 200 feet away from the site in Mr. Beasely's front yard where the shooting occurred. Immediately after hearing the shot, Officer Hollingsworth called out over the radio, "Shots fired!"] At this time, Mitchell was standing approximately eight or nine feet away from Office Williams in Mr. Beasley's front yard, positioned at about a 45 degree angle facing Officer Williams.[15]

---

Officer Chet Williams at 34; Aff. of Officer Chet Williams ¶ 14.) Plaintiff correctly points out, however, that Officer Ingram, who had approached the scene after parking her vehicle, did not hear Mitchell say this to Officer Williams or hear Mitchell make any comments to Officer Williams. (See Dep. of Kathy Ingram at 48.)

[14] Again, in his affidavit and in his deposition, Officer Williams testifies that he saw Mitchell pull a gun from his pocket and raise it toward Officer Williams. (See Dep. of Officer Chet Williams at 34-35; Aff. of Officer Chet Williams ¶ 14.) Again, Plaintiff correctly notes that Officer Ingram, who was standing about 10 feet away from Officer Williams, testified that she never saw Mitchell's gun until after Mitchell was handcuffed. (See Pl.'s Br. in Opp'n to Brs. in Supp. of Def.'s Mot. for Summ. J. 4.)

[15] In the "statement of facts" portion of Plaintiff's brief, counsel for Plaintiff describes the facts set forth in this paragraph and the three preceding paragraphs, as described by Ms. Palmer-Tesema, as follows:

The other witness, Carolyn Palmer-Tesema observed the events from the time things started off Blue Spring Road. Tesema testified that Mitchell ran from an alley into the middle of the apartment complex parking lot and then took off running, with an officer following him. (Exh. J [Tesema Dep. at 122, 125, 127].) There were three officers present. (Exh. J [Tesema Dep. at 122, 127-28, 139].) At least one officer was struggling with Mitchell, trying to handcuff him; Mitchell was not

-20-

After Officer Williams shot, Mitchell staggered backwards a step or two toward several parked cards in Mr. Beasley's front yard, dropping his gun at his feet. Officer Williams immediately advanced toward Mitchell. At this point, Officer Ingram, who was approaching from behind, passed by Officer William's right side heading toward Mitchell.[FN17: Officer Williams never saw Officer Ingram until she passed by him after he had fired the shot at Mitchell.] Officer Williams and Officer Ingram tackled Mitchell together, and they all went to the ground in Mr. Beasley's front yard.

Mr. Beasley heard the events leading up to the shooting from his bedroom. According to Mr. Beasley, he was awakened by loud noises coming from outside his house. He heard a male voice repeatedly yell, "get down, on the ground, on the ground!" After a pause of no more than three seconds, he heard a single gunshot. At that point, he immediately looked out of his bedroom window and saw Mitchell lying on the ground approximately ten feet from his house and Officer Williams nearby with his pistol still in his hand.

After going to the ground, Mitchell vigorously struggled and resisted Officer Williams and Officer Ingram's efforts to hold him down. Mitchell was rolled onto his stomach. As Mitchell continued struggling and thrashing, Officer Ingram straddled his back and began trying to pull one of his arms behind his back in order

---

fighting back or swinging, but he was resisting, and the officer was not successful in cuffing him. (Exh. J [Tesema Dep. at 129-33].) Tesema testified that Mitchell then broke loose and started to run, putting his hands up in the air. (Exh. J [Tesema Dep. at 18].) Tesema saw Mitchell drop to one knee and then to both, while his hands were still up in the air. Then an officer came over and started beating him with a baton and spraying him with something. The officer then wrestled him down and handcuffed him, with assistance from another officer. (Exh. J [Tesema Dep. at 140, 143].) Tesema's recollection was that the shooting did not occur in the grassy area, but in the parking lot. (Exh. J [Tesema Dep. at 158-59].)

(See Pl.'s Br. in Opp'n to Brs. in Supp. of Def.'s Mot. for Summ. J. 5-6.)

to handcuff him. With Officer Williams' assistance, Officer Ingram was finally able to pull one of Mitchell's arms behind his back. Officer Williams pulled out his handcuffs and secured one of Mitchell's wrists. While wrestling with Mitchell, Officer Ingram repeatedly ordered him to "Give us your other hand!" After a few seconds, Officer Williams and Officer Ingram were able to pull Mitchell's other arm behind his back and secure the other wrist.

After Mitchell was handcuffed, Officer Williams stood up and backed away a few feet, while Officer Ingram stayed near Mitchell. Officer Williams pointed to Mitchell's gun lying on the ground a few feet away and said, "There's his gun."[FN18: Mitchell's gun was a .38 caliber revolver with black tape wrapped around the plastic grips. The gun was later test fired at the Alabama Department of Forensic Sciences and found to be in working condition.] Officer Williams looked over his right shoulder, located his shell casing, and said, "There's my brass." At or around this point, Officer Hollingsworth walked into the front yard approaching Officer Williams and Officer Ingram.

Not knowing for certain where the round had struck Mitchell, Officer Williams asked Officer Ingram, "How is he?" Officer Ingram rolled Mitchell onto his side to assess his injuries. Officer Williams immediately called for an ambulance and other police units over his radio. Officer Hollingsworth and Officer Williams remained in the front yard securing the scene while Officer Ingram remained by Mitchell's side, although Officer Williams walked back to his patrol car at some point. Within minutes after the shooting, several other police officers arrived at the scene.

The paramedics arrived at the scene in Mr. Beasley's front yard at approximately 10:10 a.m. Within minutes, Mitchell was lifted onto a stretcher, placed in an ambulance, and transported to Huntsville Hospital for treatment. Officer Ingram rode in the ambulance with Mitchell. Mitchell later died as a result of a gunshot wound to his chest.

In addition to the information set out in footnotes 6-15, supra, Plaintiff refers to the deposition testimony of a citizen

-22-

who also allegedly witnessed the events. Angelia Nickles
testified that she was coming out of a friend's house when she
saw an officer swinging at a guy with a club. (<u>See</u> Pl.'s Br. in
Opp'n to Brs. in Supp. of Def.'s Mot. for Summ. J. 5.) During
that time, Nickles only saw Mitchell attempting to block the
blows. (<u>See</u> <u>id</u>.) She never noticed anything in Mitchell's hands.
(<u>See</u> <u>id</u>.) After a few minutes, Nickles was told to go inside by
the police and shortly thereafter heard a shot. (<u>See</u> <u>id</u>.) When
she later looked out the window, she saw ambulances, police and
Mitchell, face down, handcuffed. (<u>See</u> Pl.'s Br. in Opp'n to Brs.
in Supp. of Def.'s Mot. for Summ. J. 5.)

### IV.   APPLICABLE LAW AND ANALYSIS

### A. Officers Hollingsworth, Ingram and Williams - § 1983 Claims

At the outset, the Court must determine whether the shooting
of Mitchell equals - under the Fourth Amendment - the use of
excessive force in the course of arresting Mitchell.[16] The

---

[16] Plaintiff's complaint asserts her § 1983 claims under the
First, Fourth, Fifth and Fourteenth Amendments. Her First and
Fifth Amendment claims are without merit and require no further
discussion. Plaintiff asserts her Fourth Amendment claim against
"defendants." The court interprets that generality to include all
three officers, Ingram, Hollingsworth and Williams. To the extent
that is correct, summary judgment is due to be granted, without
extensive discussion, to Officers Ingram and Hollingsworth.
Plaintiff has presented no evidence to suggest that Officer
Ingram or Hollingsworth ever used deadly force, or force of any
significant nature, against Mitchell. Plaintiff's own expert
testified that Officer Hollingsworth committed no constitutional
violations and that Officer Ingram played no part in the death of
Mitchell. (<u>See</u> Dep. of Fred G. Robinette, III 96, 108.)

-23-

summary judgment motion of all three officers require that
determination by seeking judgment based upon insufficient
evidence to establish liability. The summary judgment motion of
Officer Williams additionally requires the same determination to
answer the "threshold question" raised by Officer Williams'
qualified immunity defense. See Saucier v. Katz, 533 U.S. 194,
201 (2001).

### 1. Insufficient Evidence to Establish § 1983 Liability

It is clearly established that "use of force is contrary to
the Fourth Amendment if it is excessive under objective standards
of reasonableness." See Saucier, 533 U.S. at 202; Graham v.
Connor, 490 U.S. 386 (1989). More specifically, the use of deadly
force by a police officer to seize a fleeing felon is excessive
unless the officer: (1) "has probable cause to believe that the
suspect poses a threat of serious physical harm, either to the
officer or to others" or "that he has committed a crime involving
the infliction or threatened infliction of serious physical
harm;" (2) reasonably believes that the use of deadly force was
necessary to prevent escape; and (3) where feasible, has given
some warning about the possible use of deadly force. See
Tennessee v. Garner, 471 U.S. 1, 11-12 (1985); see also Vaughn v.
Cox, 264 F.3d 1027, 1034 (11th Cir. 2001). Because "[t]he test of
reasonableness under the Fourth Amendment is not capable of
precise definition or mechanical application," Bell v. Wolfish,

-24-

441 U.S. 520, 559 (1979), "however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989) (citing Tennessee v. Garner, 471 U.S. 1. 8-9 (1985)). The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968).

The first step in any excessive force claim is to determine whether the plaintiff was subject to the "intentional acquisition of physical control" by a government actor. See Brower v. County of Inyo, 489 U.S. 596 (1989). It is clear that in wrestling with Mitchell, applying O.C. spray and utilizing his expandable baton, Officer Williams was endeavoring to gain physical control over Mitchell. It is also clear that "apprehension by the use of deadly force is a seizure[.]" See Garner, 471 U.S. at 7. The second step of such an analysis, in fact the touchstone of any Fourth Amendment excessive force examination, is an application of the "objective reasonableness" standard. See Graham v. Connor, 490 U.S. 386, 388 (1989); Pace v. Capobianco, 283 F.3d 1275, 1281

-25-

(11th Cir. 2002). That "reasonableness" standard requires asking "whether the officer's actions are objectively reasonable in light of the facts confronting the officer, regardless of the officer's underlying intent or motivation." Montoute v. Carr, 114 F.3d 181, 183 (11th Cir.1997) (citing Graham, 490 U.S. at 397). A court must additionally allow "for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." Pace, 283 F.3d at 1281 (quoting Graham, 490 U.S. at 397).

The initial determination of the seizure standard has been met here. Officer Williams fired his weapon to stop Mitchell. Mitchell was struck by the shot. Because Mitchell was hit by a bullet fired to stop him, he was subject to a Fourth Amendment seizure.[17] With regard to a determination of "objective reasonableness," the question becomes whether, given the circumstances, Mitchell "would have appeared to reasonable police

---

[17] Plaintiff argues that the officers' intrusion into Annie Horton's home without a warrant constituted an unlawful search and thereby invalidated any subsequent seizure. That argument, under the factual circumstances here, is wholly without merit. Among other reasons for this conclusion, the undisputed facts reflect that the entry of Officer Williams into the Horton home was lawful. See U.S. v. Holloway, 2002 U.S. App. LEXIS 9044 (11th Cir. 2002)(holding that in an emergency, the probable cause element for forced entry in response to exigent circumstances may be satisfied where officers reasonably believe a person is in danger).

-26-

officers to have been gravely dangerous." <u>Pace</u>, 283 F.3d at 1281.
The answer is "Yes." For actual probable cause to exist, "the
facts and circumstances must be such that the officer reasonably
could have believed that probable cause existed." <u>See</u> <u>id</u>. (citing
<u>Williamson v. Mills</u>, 65 F.3d 155, 158 (11th Cir. 1995)). Assuming
the facts in the light most favorable to Plaintiff, the Court
concludes that probable cause existed for Officer Williams to
believe that Mitchell, who was evading arrest, had several
outstanding felony arrest warrants and may have just committed
another felony. There is no dispute that Officer Williams heard
Officer Hollingsworth say over the radio that Mitchell had one or
more arrest warrants outstanding for previous domestic violence
episodes, a Class A felony under ALA. CODE § 13A-6-130 or a Class
B felony under ALA. CODE § 13A-6-131.[18] Also, the dispatcher who
Officer Williams heard requested police assistance for a domestic
disturbance involving a weapon. There also is no dispute that
Mitchell was armed with a deadly weapon, and that Officer
Williams was aware of this possibility. Further, Mitchell refused
for a time to comply with Officer Williams' instruction, designed
to determine if Mitchell was armed, given three times with

---

[18] In actuality, however, Mitchell's outstanding arrest
warrants were for menacing and reckless endangerment, both
misdemeanors under Alabama law. <u>See</u> ALA. CODE § 13A-6-23
(menacing) and § 13A-6-24 (reckless endangerment). Still, six
similar calls had been made for similar disturbances at the same
address.

Mitchell behind the front door, to "Show me your hands."

Mitchell physically resisted Officer Williams' attempts to arrest him, also consistent with his history, and continued his flight. He failed to respond to Officer Hollingsworth's initial warnings to "stop," and being told that he was under arrest. Mitchell further failed to abide by Officer Williams' repeated use of both verbal commands to "Get on the ground" and of non-deadly force(O.C. spray and expandable baton), providing yet an additional basis for inferring that Mitchell presented a risk of serious physical injury to Officer Williams or another officer.

Additionally, as stated earlier, Officer Williams was responding to a domestic disturbance call involving Mitchell in possession of a deadly weapon, in a home with a woman and several children, where the woman came out looking terrified, and where Mitchell deterred Officer Williams' entry into the house before he fled out another door with his weapon. The very nature of such an episode almost naturally entails the threatened infliction of serious physical harm to the officers or someone else. Probable cause existed to believe that Mitchell posed a threat of serious physical harm to Officer Williams at the moment that deadly force was used. In that moment, it was not feasible to give further warning.

A reasonable officer on the scene could have also believed that the danger Mitchell presented did not end after he broke

-28-

free from his physical wrestling with Officer Williams and continued his flight away from Officer Williams with his hands up. The Court must accept the facts presented by Plaintiff that, once Mitchell escaped the initial melee with Officer Williams, that Mitchell never turned to face Officer Williams again, and never drew a weapon on anyone.[19] Still, there was nothing to prevent him from doing either, or both, in a split second. See Montoute, 114 F.3d at 185.

The Court is satisfied and concludes, after resolving all reasonable doubt about the facts in favor of Plaintiff, and after resolving all justifiable inferences in favor of Plaintiff, that Plaintiff has failed to point to evidence, or come forward with evidence, sufficient to withstand a motion for judgment as a matter of law based upon insufficient evidence to support a conclusion that excessive force in violation of the Fourth Amendment was applied by Officer Williams. Given the circumstances of this case, the Court concludes that Officer Williams' use of deadly force did not violate the Fourth Amendment. Consequently, there being no dispute over a material fact, summary judgment is due to be granted Officers Williams, Hollingsworth and Ingram on the basis of insufficient evidence

---

[19] There is no dispute, however, that Officer Williams heard Mitchell yell to him, "I've got something for ya" and that Officer Williams yelled at Mitchell to "Drop it" immediately before Officer Williams fired a single shot at Mitchell which struck him, ultimately leading to his death.

with regard to Plaintiff's § 1983 claim. See <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1116-7 (11th Cir. 1993).

**2. Officer Williams' Entitlement to Qualified Immunity**

Had the Court concluded that Officer Williams did violate the Fourth Amendment, thereby determining adversely to Williams the threshold question in a qualified immunity case, the Court alternatively concludes that Officer Williams is entitled to summary judgment on his claim of qualified immunity. <u>See generally</u> <u>Saucier v. Katz</u>, 533 U.S. 194 (2001) (applying the same principles applicable to a warrantless search case in determining that qualified immunity can protect an officer in an excessive force case); <u>Pace</u>, 283 F.3d at 1282 (deadly force case); <u>Montoute</u>, 114 F.3d at 183-85 (deadly force case). In order for an officer to be shielded by qualified immunity, an officer need not have actual probable cause but only "arguable probable cause." <u>See</u> <u>Montoute</u>, 114 F.3d at 184. Because only arguable probable cause is required for qualified immunity, "the inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possesses." <u>See</u> <u>id</u>. (citing <u>Hunter v. Bryant</u>, 502 U.S. 224, 228 (1991)). Additionally, once an officer has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff. <u>See</u> <u>id</u>. (citations omitted). That means the question

-30-

is whether Plaintiff has pointed to or come forward with evidence
sufficient to show that at the time Officer Williams shot
Mitchell, no officer reasonably could have arguably believed that
Mitchell either (1)had committed a crime involving the threat of
or actual infliction of serious physical harm; or (2) posed a
risk of serious physical injury to Officer Williams or others as
he fled. See Montoute, 114 F.3d at 184. The answer to that
question is "No." The requisite evidence is not before the Court.

     Here, it is imminently clear that arguable probable cause
existed to believe both that Mitchell posed a threat of serious
physical harm to the officers through his conduct and had
committed a crime involving the threatened infliction of serious
physical harm through his actions necessitating the 911 call. At
the time he fired his weapon, Officer Williams had clearly
demonstrated that he wanted Mitchell to stop - in fact Officer
Hollingsworth explicitly ordered it -  and had been physically
resisted in his attempts to arrest Mitchell. A reasonable officer
in Officer Williams' position could have concluded that Mitchell,
who was fleeing a domestic disturbance call while armed, posed a
serious threat of harm to officers and others in the area. As
stated earlier, the assumed fact that Mitchell fled with his
hands up does not remove the episode from one fraught with
continued danger. Therefore, even if a reasonable jury could find
that Officer Williams was mistaken in his belief that he had

-31-

probable cause to use deadly force, the Court is satisfied that at least arguable probable cause existed. Accordingly, there being no dispute as to any material fact, the Court determines that summary judgment is due to be granted Officer Williams because he is protected by qualified immunity.

**B. City of Huntsville and Police Chief Owens - § 1983 claims**

Plaintiff additionally asserts a § 1983 claim against the City of Huntsville and its police chief, Compton Owens, asserting that the City is liable as a result of it's policy regarding domestic-call responses and/or a failure to train, and asserting that Chief Owens is liable for his failure to establish proper guidelines for the officers and/or to train them. Liability in either instance must be premised upon an actual constitutional violation. Simply stated, because Mitchell's recognized constitutional right to be free from excessive force was not violated, no liability can be attached to these additional defendants. Both of them seek summary judgment on the § 1983 claim because there were no constitutional violations. There is no dispute as to any material fact which prevents them having summary judgment on that basis. Accordingly, summary judgment on the § 1983 claim is due to be granted as to defendants City of Huntsville and Huntsville Police Chief Compton Owens.[20]

---

[20] The Court does not deem it necessary to rule on Police Chief Owens' qualified immunity defense alternatively.

-32-

### C. State Law Claims Against City of Huntsville

Count Two of the complaint states a claim against the City of Huntsville under Alabama's Wrongful Death Act. See ALA. CODE § 6-5-410 (1975). The Court only has supplemental jurisdiction over that claim under 28 U.S.C. § 1367. Since the order contemplated by this Memorandum of Decision will dispose of all claims in this action over which the Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over that state law claim which will be dismissed, without prejudice, pursuant to 28 U.S.C. § 1367. A separate order to that effect will be entered.

A separate final judgment with regard to the § 1983 claims will be entered.

DONE this _____17th_____ day of _____JUNE_____, 2002.


_____

SENIOR UNITED STATES DISTRICT JUDGE

-33-