FILED

2006 Jun-13  PM 03:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **JANICE EASON, as** ] <br> **Administratrix of the Estate of** ] <br> **Wallace Mitchell** ] <br> ] <br> **Plaintiff,** ] <br> ] <br> **v.** ] <br> ] <br> **CITY OF HUNTSVILLE,** *et al.*, ] <br> ] <br> **Defendants.** ] | **Case No.: 5:00-cv-0969-VEH** |

---

## <u>MEMORANDUM OF OPINION</u>

The Court presently has before it the Motion for Summary Judgment filed by Defendant Huntsville Police Officer Chet Williams (hereinafter "Officer Williams". As administratrix of the estate of Wallace Mitchell(hereinafter "Mitchell"), Plaintiff, Janice Eason (hereinafter "Eason"), filed this 42 U.S.C. § 1983 lawsuit for unconstitutionally excessive use of deadly force. All claims in Eason's Complaint arise out of the fatal shooting of Wallace Mitchell by Officer Williams on April 17, 1998. Following the Eleventh Circuit's decision in this case affirming, in part, and vacating, in part, the District Court's previous summary judgment rulings, the only remaining claims are as follows: (1) a section 1983 Fourth Amendment excessive-force claim against Officer Williams; and (2) a state law wrongful death claim against

the City of Huntsville.[1]

Officer Williams has since moved for summary judgment and the issues raised in his motion has been briefed by both parties and is now ripe for decision. Upon full consideration of the legal issues and arguments presented, Officer Williams's motion is due to be **DENIED**.

## Procedural History

As administratrix of the estate of Wallace Mitchell, Janice Eason, Mitchell's sister, filed this action under 42 U.S.C. § 1983 against Huntsville Police Officers Chet Williams, John Hollingsworth, and Cathy Vaughn, the City of Huntsville, and Huntsville Police Chief Compton Owens. The suit alleged violations of Mitchell's First, Fourth, Fifth, and Fourteenth Amendment rights based on the alleged excessive use of force against Mitchell, and included a state law wrongful death claim against the City of Huntsville under Alabama's Wrongful Death Act. By Order entered June 8, 2000 (doc. 9), the district court dismissed all claims against the three officers in their official capacities. Each of the Defendants then moved for summary judgment as to all the remaining claims.

---

[1] *See Janice Eason v. City of Huntsville, et al.,* No. 00-H-0969 (N.D. Ala., June 17, 2002)(Hancock, J.) (order granting summary judgment on section 1983 claims and declining supplemental jurisdiction over state law wrongful death claim), *aff'd in part and vacated in part* by *Janice Eason v. City of Huntsville, et al.*, No. 02-13519 (11th Cir. Sept. 16, 2003).

2

After thorough briefing, the Court concluded that there were no disputes of material fact and granted summary judgment to each of the defendants as to all § 1983 claims alleged in the Complaint.  Because any possible § 1983 liability against the City of Huntsville and Chief Owens for failure to train or for maintaining an unconstitutional policy was contingent on an actual constitutional violation and this Court had concluded that no such violation had occurred, the Court also granted summary judgment in favor of the City of Huntsville and Owens.  With respect to the state law wrongful death claim against the City of Huntsville, the Court declined to exercise supplemental jurisdiction, and dismissed that claim without prejudice pursuant to 28 U.S.C. § 1367(c).

By Order [2] dated September 16, 2003, and issued as mandate on October 16, 2003, the United States Court of Appeals, Eleventh Circuit, vacated the Court's grant of summary judgment with respect to the Fourth Amendment excessive force claim against Officer Williams and the Court's dismissal of Eason's state law wrongful death against the City of Huntsville, which relied on 28 U.S.C. § 1367(c)(3).[3]  In all other respects, the Court's decision was affirmed.  The case was then remanded for

---

[2]Hereinafter referred to as *Janice Eason v. City of Huntsville, et al.,* No. 02-13519 (11th Cir., Sept. 16, 2003)..

[3]"The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if …the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

further proceedings.

Following remand, Officer Williams has moved for summary judgment on Eason's remaining claims.  Specifically, Officer Williams moves for summary judgment on Plaintiff's claims under § 1983 arguing that: (1) Eason's constructive admission justifies Officer Williams's use of deadly force; (2) Palmer-Tesema's testimony does not preclude summary judgment in favor of Officer Williams; and (3) Officer Williams is entitled to qualified immunity.   *See Def. Brief in Support of Motion for Summary Judgment*, p.2.

## Facts

As set forth in the Eleventh Circuit's October 16, 2003 Opinion, the underlying material facts[4] are as follows:

> During the morning hours of April 17, 1998, Wallace Mitchell and his girlfriend Annie Horton began an argument at her home located at 5004 Ortega Circle in Huntsville, Alabama, where she lived with Mitchell and her children.  Mitchell wanted to spend his day off of work at home with Horton, but Horton wanted to go visit her mother.  Mitchell refused to allow her to leave the house, pulled out his .38 caliber revolver handgun, informed Horton that she was not going anywhere, and went and sat down on the front steps of the house with the gun in his hand.
> While Mitchell and Horton were arguing, Juanna Horton, one of

---

[4] There are several important disputes between the parties as to what precisely transpired in the period immediately preceding the firing of the fatal shot that killed Wallace Mitchell.  As is our obligation at the summary judgment stage, we will resolve all disputes in favor of Eason's version of events.

4

Horton's daughters, left the house and walked to a nearby convenience store. Using a pay phone at that location, she telephoned her older brother Danny Hyter, who lived with his grandmother. She told Hyter what was happening and asked him to contact the police. At approximately 9:40 a.m., Hyter placed a "9ll" telephone call to the police. Hyter requested police assistance at the Horton residence. He explained that his sister had called him and told him that Mitchell, her mother's friend, was at the house and was threatening to shoot her mother. Hyter also noted that he had previously witnessed Mitchell with a gun, that Mitchell was wanted for shooting the car window out at his residence, and that there were outstanding warrants for his arrest.

At approximately 9:42 a.m., a dispatcher for the Huntsville Police Department advised over the radio that a domestic disturbance involving Mitchell and a female was in progress at 5004 Ortega Circle and that Mitchell reportedly had a gun. Officer John Hollingsworth, who was riding in a patrol car with Officer Kathy Ingram, acknowledged the dispatcher's call and headed toward the Horton residence. Officer Hollingsworth was familiar with Mitchell, knew that he was frequently involved in domestic disturbances, knew that he had outstanding warrants possibly including a felony warrant,[5] and knew that he had previously fled from the back of the house upon the arrival of the police. For these reasons, Officer Hollingsworth asked the dispatcher to send a third officer to the location. Having heard the dispatcher's original call, Officer Chet Williams informed that he was already on the way. Officer Williams heard the dispatcher explain that Mitchell was reportedly armed with a gun, and also heard Officer Hollingsworth advise over the radio that Mitchell had outstanding warrants, possibly including a felony warrant, and had a tendency to run out of the back of the house when police arrived.

Officers Hollingsworth, Ingram, and Mitchell arrived at the Horton residence at 5004 Ortega Circle at approximately 9:50 a.m. Ingram let Hollingsworth out of the car so that he could approach the home from the rear to prevent any escape attempt by Mitchell. Ingram

---

[5]It was later determined that Mitchell was not charged with a felony for the incident in which he shot through the back window of Horton's vehicle while it was occupied by Horton and her children.

and Williams then parked their vehicles in front of the house next door to Horton's, exited the vehicles, and approached the residence. Officer Ingram walked up to the front porch and knocked on the front door. At the same time, Williams checked Hollingsworth's location and the returned to the front. At this time, Horton and three children came out the front door. After Horton and the children exited the house, Mitchell came to the front door exposing only his face, his left shoulder, and left hand. Officer Williams took a step up towards the front porch about three to four feet away from Mitchell and twice asked Mitchell to show both of his hands. Both times, Mitchell responded only by saying "what." Then, Officer Williams reached down and unsnapped his gun holster and repeated his request for a third time. This time, Mitchell responded with "hey, hey, what's going on," and began to engage in some movement behind the door. Then, he leaned out of the front door with his face between both of his hands. Officer Williams said to Mitchell, "that's all I wanted to see" and then asked him if he was Quincy.[6] Mitchell said "yes." Officer Williams then took a step towards Mitchell, who then started backing into the house. Officer Williams said "hold up until we figure out what's going on here." In response, Mitchell attempted to shut the front door. Before he could, Officer Williams stuck his foot in the door and attempted to open it as Mitchell attempted to get the door closed. After only a brief struggle, Mitchell let go of the door and took off running through the house.

Officer Williams, followed by Officer Ingram, chased Mitchell through the house, out the side door, and into the backyard. Concerned about the commotion caused by the chase, Officer Hollingsworth had moved out of position and was not able to head off Mitchell's exit into the backyard towards the wooded area located behind the property. A neighbor testified that an officer yelled something to the effect of "Come back here, don't you run, I'm going to kick your ass."[7] Led by Officer Hollingsworth, the three officers then proceeded to chase Mitchell into the woods. After confirming that Officer Hollingsworth could continue

---

[6] Although some of his relatives have testified that they had no knowledge of him going by any different names, Wallace Mitchell was apparently known by some as "Quincy."

[7] Officer Hollingsworth testified that as Mitchell exited the house, he called Mitchell by name, telling him to stop and informing him that he was under arrest.

the pursuit on foot, Officer Williams ran back to his patrol car in an effort to reach the other side of the woods where Mitchell was likely to exit.  Officer Ingram decided to do the same.

Officer Williams sped around to the block to the other side of the wooded area.  As Officer Williams approached an apartment complex located on the other side of the woods, he noticed Mitchell walking toward him on the sidewalk.  Officer Williams quickly pulled into the parking lot of the apartment complex.  At this point, Mitchell quickly turned and began running in the opposite direction.  Officer Williams quickly stopped and exited his vehicle, and pursued Mitchell on foot.  Mitchell ran to the other end of the apartment complex into a grassy area between the apartment complex and a house.  Mitchell's flight was slowed by a chain link that ran parallel to the road, between the apartment complex and adjacent house.  Before reaching the fence, Mitchell slipped and fell in a shallow ditch near the fence line, enabling Officer Williams to catch up to him.

As Officer Williams grabbed the back of Mitchell's shirt near his right shoulder, Mitchell spun around and swung at Officer Williams.  Officer Williams stepped back, pulled out his oleoresin capsicum (pepper spray), and sprayed Mitchell in the face.  All this time, Officer Williams repeatedly yelled at Mitchell to "get on the ground."  Apparently unfazed by the spray, Mitchell refused to get on the ground and tried to run away from Officer Williams.  After a brief escape, Officer Williams caught back up with Mitchell a few feet further down the fenceline and again Mitchell turned to swing at Officer Williams.  When he did, Officer Williams again backed up, sprayed Mitchell in the face, and repeatedly commanded Mitchell to "get on the ground."[8]  While some testimony seems to indicated that Mitchell simply stood and wiped his eyes after he was sprayed with the pepper spray, it is undisputed that Mitchell disregarded Officer Williams's commands to "get on the ground."

Because Mitchell was still physically resisting Officer Williams's attempts to get him down on the ground and appeared to be unaffected

---

[8]At around this time, Officer Ingram approached and parked her vehicle in the apartment complex parking lot, exited the vehicle, and hurriedly ran in the direction of Officer Williams and Mitchell.  Pursuing on foot, Officer Hollingsworth had not yet arrived.

by the spray, Officer Williams dropped his spray and pulled out his expandable baton.  Officer Williams pushed Mitchell against the fence and struck him three or four times on the left thigh in an attempt to gain control of Mitchell by knocking his legs out from under him.  While striking Mitchell, Officer Williams continued to repeat his command for Mitchell to "get on the ground."  The baton strikes were unsuccessful and Mitchell continued to refuse to go to the ground.  Angela Nickels, an eyewitness to some of the events preceding the shooting, testified that she saw Mitchell standing up, with nothing in his hands, attempting to block the blows of the baton and attempting to grab on to the baton.  Again, the undisputed testimony from all of the witnesses is that Mitchell would not go to the ground.

It is at this point in the chain of events that Mitchell is shot by Officer Williams.  With respect to this shooting, the recollections of the eyewitnesses and the parties significantly differ as to material facts.  As we are required to do at the summary judgment stage, we construe the facts and all reasonable inferences therefrom in the light most favorable to the non-movant.  The evidence most favorable to the non-movant with respect to the use of deadly force in the shooting of Mitchell comes from Carolyn E. Palmer-Tesema, an eyewitness who was driving down the street at the time these events took place.  Palmer-Tesema testified that she stopped her car, saw Mitchell wrestling with an officer, break free from that officer, and begin to run away.  Then, she testified that Mitchell, with his back to the officer (and her), suddenly stopped and put both of his hands in the air above his head "as if he were giving up." While his hands were in the air, she testified that she heard a gunshot, saw Mitchell lose control of his body, twist around toward the officer, and fall to one and then both knees.  Then, she states that an officer came over to Mitchell and struck him with the baton, sprayed him with the pepper spray, and wrestled him to the ground.  A female officer approached with gun drawn, and assisted the other officer in handcuffing Mitchell.  The witness testified that while she had a completely unobstructed view of the shooting, the only sound she heard was the firing of the single gunshot.[9]  Mitchell died from the single

---

[9]We recognize that Officer Williams's testimony presents a dramatically different version of events leading up to and including the shooting of Mitchell.  Officer Williams describes a

gunshot wound.  Mitchell's handgun was found on the ground near his body.

*See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, p. 2-10 (11th Cir., Sept. 16, 2003).

## Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and

---

textbook example of self-defense.  According to Officer Williams, while he was still struggling to get Mitchell on the ground, Mitchell pushed away from him, backed up <u>facing</u> him, stated "I've got something for you," pulled a handgun from his right front pants pocket and began aiming it at Officer Williams.  In response, Office Williams back peddled, unholstered his service weapon, told Mitchell to "drop it," and then fired one round at Mitchell striking him in the chest.  [Remainder of footnote omitted].

admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See *Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such

a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to _affirmatively_ show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case. _Fitzpatrick_, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence

sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## Analysis[10]

Considering the evidence in the light most favorable to Eason and drawing all reasonable inferences from that evidence in her favor, the only alleged constitutional violation supported by any evidence in this case is a potential Fourth Amendment excessive force claim against Officer Williams for the shooting of Mitchell.  October 16, 2003, Judgment and Opinion of the Eleventh Circuit, p. 15.

1.    **Fourth Amendment[11]**

"The first step in reviewing an excessive force claim is to determine whether the plaintiff was subject to the 'intentional acquisition of physical control' by a government actor." *Vaughn v. Cox*, No. 00-14380,-F.3d-, 2003 WL 22025451, at *3 (11th Cir. Aug. 29, 2003).  "[There can be no question that apprehension by the use

---

[10] The analysis portion of this Opinion is based primarily on the October 17, 2003 Judgment of the United States Court of Appeals for the Eleventh Circuit.

[11] The following Fourth Amendment legal framework is adopted verbatim from the October 17, 2003 Judgment of the United States Court of Appeals for the Eleventh Circuit.

of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Carr v. Tatangelo*, No. 01-14621, slip op. at 3229 (11th Cir. July 23, 2003) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).  It must therefore be determined whether the evidence creates a genuine issue of material fact as to whether this seizure by deadly force was reasonable under the Fourth Amendment.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of arrest."  *Lee v. Ferrarro*, 248 F.3d 1188, 1197 (11th Cir. 2002).  "The reasonableness inquiry in [a Fourth Amendment] excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight...The calculus os reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

*Id*. at 396-97.  "[The question is whether the totality of the circumstances justifies a particular sort of seizure." *Id*. at 396 (quoting Garner, 471 U.S. at 8-9).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth

Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The "proper application [of this balancing test] will depend on such factors as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

In this case, deadly force was used by Officer Williams to seize Mitchell. This Court [the Eleventh Circuit] has previously set forth the well-established law with respect to the use of deadly force. It is constitutionally permissible for a police officer to use deadly force to seize a fleeing[12] felony suspect when the officer:

> (1)'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm;' (2) reasonably believes that the use of deadly force is necessary to prevent escape; <u>and</u> (3) has given warning about the possible use of deadly force, if feasible.

*Vaughn*, --F.3f--, 2003 WL 22025451 at *4 (quoting *Garner*, 471 U.S. at 11-12).[13]

**<u>Testimony Pertaining to the Fourth Amendment Reasonableness Standard</u>**

The record in the present case indicates substantial resistance asserted by

---

[12] Issue here is whether he was still fleeing at the time.

[13] The legal framework adopted by this Court from the October 16, 2003, 11th Circuit Opinion ends here.

Mitchell from the time the initial encounter with Officer Williams until the time that Mitchell was placed in handcuffs.  However, in light of the fact that the Court shall view the evidence in the light most favorable to Eason, the Court is particularly concerned with the evidence which tends to indicate, or at the very least infer, that prior to being shot by Officer Williams, Mitchell's conduct reflected an attempt at surrendering to Officer Mitchell.[14]

Eyewitness Palmer-Tesema testified that she saw Mitchell physically struggling with an officer.  She testified unequivocally that Mitchell got up and ran a few feet away from the officer, stopped with his back to the officer, and then raised his hands into the air "as if he were giving up."  *See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, pp. 23-24 (11th Cir., Sept. 16, 2003).  She testified that, soon thereafter,  she heard a gunshot and saw Mitchell's body twist around, fall to one knee and then fall to both knees.  *Id.*  Palmer-Tesema testified that following the shooting, a male officer approached Mitchell, struck him with a baton, and sprayed him with pepper spray.  *Id.*  According to Palmer-Tesema, another male officer provided assistance and the two officers wrestled Mitchell to the ground and handcuffed him. Palmer-Tesema insisted that she "had no doubt" that what she testified to regarding

---

[14] *See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, pp. 21, fn. 9 (11th Cir., Sept. 16, 2003).

the shooting of Mitchell actually occurred.   *Id.*

Officer Ingram testified that she was approximately ten feet from Officer Williams at the time Officer Williams shot Mitchell.  Given the location  of Mitchell with relation to that of Officer Williams, Officer Ingram  was approximately eighteen to twenty feet from Mitchell at the time of the shooting. Despite the distance, Officer Ingram testified that she did not see Mitchell draw a gun, did not hear Mitchell say "I've got something for you," and did not hear Officer Williams yell "drop it" prior to shooting Mitchell[15].

In its opinion, the Eleventh Circuit recognized that the testimony of Ingram alone may not be sufficient to create a genuine issue of material fact, however, it does, to some extent corroborate  Palmer-Tesema's testimony. *October 16,  2003, 11th Circuit Opinion*, p. 20.  Furthermore, the Eleventh Circuit stated therein that a reasonable inference may be made from Palmer-Tesema's account that Mitchell did not have a weapon in his hands as he held them up in the air, i.e. that this was a signal of surrender. *See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, p. 19, 20, fn. 4 (11th Cir., Sept. 16, 2003).

---

[15]Officer Williams testified......that Ingram was too far to hear and that Mitchell was between the two of them so her line of vision was blocked.

## 2.    Eason's Constructive Admission

In his Second Motion for Summary Judgment, Officer Williams seeks summary judgment on Eason's Fourth Amendment excessive force claim.  Eason alleges that Officer Williams violated Mitchell's Fourth Amendment right to be free from unreasonable seizure by using excessive force against Mitchell which resulted in his death.  Specifically, Officer Williams argues that because Eason failed to respond to the following request for admission,  the fact that Mitchell drew a gun on Officer Williams has been admitted by Eason by operation of law and Palmer-Tesema's testimony cannot be used in refutation.  The admission is as follows: "Admit that on April 17, 1998, Wallace Mitchell pointed or attempted to point a .38 caliber revolver, serial number G159999, with black tape wrapped around the plastic grips, at Officer Chet Williams."

In support of Officer Williams's assertion, he claims that Eason,  by virtue of her failure to respond to a certain request for admission, must be deemed to have admitted the facts set forth in the request by operation of law. Although this argument was raised in Officer William's first motion for summary judgment, in its opinion, the Eleventh Circuit  took issue with the fact that the district court, which originally granted summary judgment in favor of Officer Williams, failed to explicitly address this argument in its Order.  Therefore, the Eleventh Circuit instructed that,  "[o]n

17

remand, the district court in its discretion  may address this issue, and, if Eason is deemed to have admitted these facts, the district court may reconsider the propriety of summary judgment under such admitted facts." *See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, pp. 24 (11th Cir., Sept. 16, 2003).

In response to Officer Williams's argument, Eason contends that her constructive admission is ineffective in justifying Officer Williams's use of deadly force to the extent that the text of the request for admission fails to delineate a time frame for Mitchell's alleged conduct. (*See Pl. Resp. to Williams's Mot. for Summ. J.*, p. 10).  Furthermore, Eason argues that her admission is ineffective because she was not present *at* the shooting and thus she lacks personal knowledge to admit or deny what happened.  Officer Williams contends that in her response, Eason has done nothing but attempt to undo her admission by taking it out of the "obvious and only reasonable context." (*See Def. Reply Brief*, p. 6).

Although Fed. R. Civ. P. 56(e) requires an affidavit be made on personal knowledge, Fed. R. Civ. P. 56(c), which allows for admissions to serve as a predicate for summary judgment, has no such personal knowledge requirement. Fed. Rule. Civ. P. 36(a) states the following in  regard to requests for admissions:

> An answering party may not give lack of information of
> knowledge as a reason for failure to admit or deny  unless
> the party states that the party has made reasonable inquiry

> and that the information known or readily obtainable by the
> party is insufficient to enable the party to admit or deny.

Fed. R. Civ. P. 56(c).  Although it is accurate that Eason need not file an affidavit ,

the Court finds this entire argument irrelevant in that it does not address the critical

issue at hand.  The critical issue is not *whether* she has admitted the information,

rather, it is *what*  information she has admitted and how relevant the specific

information is to the outcome of the case.

The issue presented to the Court by Officer Williams is whether Eason's failure

to  respond to a request for admission propounded in discovery under Fed. R. Civ. P.

36, necessarily results in the granting of summary judgment in favor of Officer

Williams.  Officer Williams argues that in light of Eason's failure to respond, Eason

must be deemed to have automatically admitted this fact by operation of law.

The Court, in its discretion, has considered the issue.  Officer Williams asserts

that based upon the admission*,*  Officer Williams was justified in using deadly force

against Mitchell.  Eason points out however, that the law does not allow an officer to

shoot a suspect who no longer poses a threat.  *See Tennessee v. Garner*, 471 U.S. 1,

11 (1985).  Based on the *Garner* standard, it is axiomatic that a police officer is

prohibited from using deadly force against a suspect who has his hands in the air;

presumably, a suspect with his hands in the air no longer poses an immediate threat

19

to the officer or the lives of others.  In complying with the Court's duty to view the facts in the light most favorable to Eason,  the Court accepts as true that account that just prior to being shot by Officer Williams, Mitchell's empty hands were raised above his head in an effort to surrender.

A constructive admission on the part of Eason compels a conclusion only that *at some point in time* on April 17, 1998, Mitchell either pointed or attempted to point a gun at Officer Williams.  Despite the constructive admission, the Court is primarily concerned with whether, *at the time Mitchell was shot*, Officer Williams was acting out of self defense.  Solely for the purpose of illustrating the Court's point, assume for a moment that during Officer William's pursuit of Mitchell, Mitchell briefly turned around toward Officer Williams to gauge whether or not Officer Williams was gaining on him; by virtue of his position, Mitchell's gun was pointed in Officer Williams's direction.  Assume that, immediately thereafter, Mitchell turned back around facing away from Officer Williams to continue his escape and instead of running forward, he tripped on something and the gun flew out of his hand landing a distance away in the direction the pursuit was headed.  Assume still that Mitchell stood up, dusted off his knees and continued running for a short  period of time.  Next, assume that Mitchell slowed to a halt,  raised  his empty hands in the air as a sign of surrender and, in turn, was shot by  Officer Williams.  Assume that Palmer-

Tesema witnessed the entire pursuit.  Based upon Officer Williams's assertion, despite the fact that Mitchell was no longer fleeing and posed no immediate threat to Williams or others, Eason's constructive admission should relieve him from any liability and provides justification for his use of deadly force against Mitchell.  This scenario is meant to illustrate the importance of vital details and the significance that a specific time frame can have on the outcome of a case.  It is for this reason that the Court cannot adopt Officer Williams's argument that Eason's admission necessarily justified his use of deadly force.  The facts, as well as the testimony, clearly create a genuine issue of material fact as to whether or not Officer Williams used excessive force when he fatally shot Mitchell.  Accordingly, the Court concludes that summary judgment on the ground that Eason's admission necessarily justified Officer Williams's use of deadly force is due to be **DENIED**.

**3.      Palmer-Tesema's Testimony**

Officer Willians first argues that there is Eleventh Circuit precedent supporting his assertion that Palner-Tesema's testimony does not preclude summary judgment.  Next, he argues that Palmer-Tesema's failure to see a gun does not give rise to an inference that Mitchell did not draw his gun.

**a.      The Testimony**

First, Officer Williams argues that Palmer-Tesema's testimony does not

preclude the Court from granting summary judgment in his favor.  He contends that

although  Palmer-Tesema's testimony conveys a different account of the shooting

incident than his account, it  does not create a genuine issue of material fact on the

question of whether or not Officer Williams was justified in using deadly force.

Only disputes over facts that might affect the outcome fo the suit under governing law

will properlly preclude summary judgment."  Anderson v. Liberty Lobby, 477 U.S.

242, 248 (1986).  Officer Williams contends that in the present case, the oputcome-

determinative inquiry is whether Officer Williams justifiably shot Mitchell in self-

defense.   Officer Williams asserts that Palmer-Tesema's testimony does not create a

genuine issue of material fact because she does not contradict that Mitchell threatened

Officer Williams with a weapon.  The Court disagrees.  The Court finds that given the

inference that Mitchell raised his hands in an attempt to surrender and that the

testimony that he had no weapon on his person immediately prior to being shot, thwe

Court finds that Williams's account is in fact contradicted.  It seems as though

Officer Williams has repeatedly forgotten the standard that the Court must use in

deciding a summary judgment motion.

Furthermore, Williams lists six examples of facts from the record that, by virtue

of either not being contradicted or not being disputable,  result in  "one and only one

reasonable conclusion" that can be drawn from the evidence:  "Officer Williams

justifiably shot Mitchell in self defense because Mitchell threatened him with a weapon."[16]  This Court disagrees with William's assertion.  Eason has presented the Court with evidence that Mitchell appeared to be surrendering just prior to being shot.[17]  The issue is not whether Mitchell had a gun at any point during the course of events, the issue is whether *at the time Mitchell was shot*, he posed a significant enough threat to Officer Williams or others to justify Officer Williams's use of deadly force.  The issue is not whether the gun found on the scene belonged to Mitchell, the issue is how and when did it get there.  Because the assertion that Officer Williams gave a verbal warning of the pending shot is not corroborated and is in direct conflict with the testimony of Palmer-Tesema, the Court must accept Palmer-Tesema's testimony and thereby discount that of Officer Williams.  For the purpose of summary judgment, where the facts differ, the Court is obliged to accept the nonmoving party's account of the events.[18]  *See fn* 4, p.16 of Def. brief (doc84).  Therefore, the Court

---

[16]*See* Defendant's brief, p. 16.

[17] Although Palmer-Tesema initially testified that Mitchell was shot in the back, it was later confirmed that he was in fact shot in the chest.  Inhis original motion for summary judgment, Officer Williams attempted to convince the Court that Palmer-Tesema's testimony should therefore be discredited in its entirety.  The Eleventh Circuit explained that at the summary judgment stage, it is aware of no authority for rejecting  the entire testimony from an eyewitness simply because it can be shown that the witness was mistaken as to a particular detail.  Issues of witnesses credibility in cases like this must be left to the jury.  *See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, p. 22 (11th Cir., Sept. 16, 2003).

[18] The record facts include: (1) Mitchell had his distinctive gun on his person at Horton's house and when he fled from Horton's house; (2) prior to the shooting, Mitchell threatened

accepts Palmer-Tesema's testimony that Mitchell raised his empty hands in the air just prior to being shot.

### b.   Eleventh Circuit Cases

Officer Williams also contends that the reasonableness of his use of deadly force is supported by a string of Eleventh Circuit cases[19].  Officer Williams cites to several deadly force cases in which the Eleventh Circuit found summary judgment appropriate, despite seemingly conflicting eyewitness testimony.  Officer Williams contends that the cases involve eyewitness accounts which were proffered by people who had viewed the events under less than ideal conditions.  In each of the cases cited by Officer Williams, the Eleventh Circuit deemed the eyewitness's testimony insufficient to preclude summary judgment in favor of the law enforcement officer. However,  it is critical to understand that only those cases which are clearly devoid of any need for factual determination may be disposed of by summary judgment.  In the interest of judicial economy, the Court will refrain from delving too far into the

---

Officer Williams, "I've got something for ya," and then Officer Williams saw Mitchell draw a gun from his right front pants' pocket; (3) Officer Williams immediately yelled , "drop it!," "and then shot Mitchell; (4) after he shot Mitchell, Officer Williams saw Mitchell drop his gun at his feet; (5) Mitchell's gun was on the ground near his body just after the shooting; (6) Mitchell was shot in the chest and not from behind, thus confirming that Mitchell was facing Officer Williams when he was shot.

[19] *Kessinger, v. Herrington*, 381 F.3d 1243 (11th Cir. 2004); *Harrell v. Decatur County, Georgia*, 22 F. 3d 1570 (11th Cir. 1994); and *Pace v. Capobianco*, 283 F.3d 1275(11th Cir. 2002).

specific facts of each of the cases and, instead, concludes that each of the cases is

significantly distinguished from the present case.[20]

### c.    Palmer-Tesema's Failure to See a Gun

Next, Officer Williams argues that Palmer-Tesema's *failure to see* a gun does

not give rise to a reasonable inference that *Mitchell did not draw his gun.*[21]   First,

Officer Williams provides no authority which states that a failure to see something

---

[20] In *Kessinger, v. Herrington*,  the overwhelming evidence and testimony confirmed the officer's account of what occurred. Whereas in the present case, substantial evidence and testimony contradict Officer Williams's account. Furthermore, in the first case, the suspect was undisputedly putting the lives of many in danger by walking in the middle of the street in a crazed manner in his attempt to commit suicide.  Finally, in *Kessinger,* the suspect attacked the offier claiming to be Jesus Christ.  *Kessinger, v. Herrington*, 381 F.3d 1243, 1246-1249 (11th Cir. 2004). In *Harrell v. Decatur County, Georgia*, 22 F. 3d 1570 (11th Cir. 1994), opinion vacated and substituted, 41 F.3d 1494 (11th Cir. 1995), the contradicting testimony dealt with only whether the suspect was reaching for a gun when he was shot.  The Court determined that this was not a genuine issue of material fact.  In *Harrell,* the suspect brutally beat the officer with a flashlight.  He then returned to his car to either obtain a gun ore flee.  *Harrell*, 22 F.3d at 1579-81. The Court determined that based on the totality of the circumstances, the Officer was justified in believing that he was in immediate harm  of serious bodily injury and that the suspect was attempting to flee.  It was undisputed that the suspect posed a grave danger to the officer and the public.  Finally, in *Pace v. Capobianco*, the testimony by the eyewitness was based on a "belief" rather than a fact as required by Fed. R. Civ. P. 56(e).  *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002).  In the present case, the testimony of Palmera-Tesema and Officer Ingram are based not based on belief.  Second, and perhaps more convincing, is that the suspect in *Pace* engaged in a fifteen minute high speed car chase with the police. , aggravated assault under state law.  Furthermore, the suspect remained in his vehicle the entire time, with the engine running, even after being cornered b the police on the cul-de-sac.  The officers were forced to shoot the suspect in the car when he began driving the car toward them. Pace, 283 F.3d at 1281-82. Clearly, this case is factually significantly distinguishable from the present case.

[21] As stated above,  the Eleventh Circuit has already stated that a reasonable inference drawn from Palmer-Tesema's testimony is that Mitchell was surrendering when he raised his hands in the air just prior to being shot.  *See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, pp. 19-20 (11th Cir., Sept. 16, 2003).

*necessarily* prohibits the finding of a reasonable inference.  Next, it is not merely Palmer-Tesema's testimony that she did not see a gun that the Court is concerned with in determining whether or not the inference that Mitchell was surrendering was reasonable, it is the  totality of the circumstances that the Court uses to determine whether there is sufficient evidence to gives rise to an inference.  *Garner*, 471 U.S. at 8-9. The Court record includes the testimony of two eyewitnesses to the events leading up to Mitchell's shooting.

Palmer-Tesema testified that immediately prior to the shooting, Mitchell's empty hands were raised in the air in front of Officer Williams.  Officer Ingram testified that she did not see the suspect draw his gun or threaten Officer Williams that he "had something" for him; and she did not hear Officer Williams yell "drop it" to the suspect at any time prior to shooting Mitchell.  *See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, p.20 (11th Cir., Sept. 16, 2003).[22]  As was articulated by the Eleventh Circuit in its Judgment, "a reasonable inference from Palmer-Tesema's account that Mitchell did not have a weapon in his hands as he raised them..., i.e. that this signal was signal of surrender." *See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, p.21, fn. 9 (11th Cir., Sept. 16, 2003).  The law

_____

[22] Officer Williams contends that Officer Ingram did not hear the dialogue because she was too far away.  He contends that she couldn't see what Officer Williams saw because he was in the way of her direct line of vision.

prohibits the use of deadly force against a fleeing suspect when the suspect no longer poses a threat to the officer or others.  The account accepted by the Court for the purpose of summary judgment is that of Palmer-Tesema: the suspect was standing with his hands in the air surrendering to Officer Williams.  As has been articulated repeatedly throughout this opinion, during the summary judgment stage, the Court must accept the facts and inferences in the light mist favorable to the non-movant. *Graham v. O'Connor*, 490 U.S. 386, 397 (1989).   Furthermore, Palmer-Tesema's testimony that she did not see a gun in Mitchell's hands or hear him threaten Officer Williams is both relevant and significant in determining the propriety of summary judgment based upon the totality of the circumstances. Therefore, summary judgment is due to be **DENIED** based on the claim that Palmer-Tesema's testimony and failure to see a gun does not giver rise to an inference that he did not draw his gun.

### 4.     Qualified Immunity

Officer Williams argues that whether or not the Court finds a constitutional violation in connection with his use of deadly force against Mitchell, he is entitled to qualified immunity.

 "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a

reasonable person would have known." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003)(internal quotation marks omitted). The applicability of qualified immunity is a question of law to be decided by the court. *Ansley v. Heinrich*, 925 F.2d 1339, 1341, 1345 (11th Cir. 1991). The purpose behind the doctrine of qualified immunity is "to protect government officials performing discretionary functions from the burdens of trial and broad-reaching discovery in cases that are insubstantial or that do not allege violations of clearly established law." *Harrell* (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Furthermore, the purpose is "to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations omitted). "To receive qualified immunity, a government official must first prove that he was acting within his discretionary authority." *Id*. at 1357-58. In this case, it is undisputed that Officer Williams was clearly acting within his discretionary authority.[23]

---

[23] Officer Williams was pursuing Mitchell in response to a domestic disturbance call during the course of his work day as a Huntsville Police Officer. *See Janice Eason v. City of Huntsville, et al.,* No. 02-13519, p.3 (11th Cir., Sept. 16, 2003). The manner by which Williams seized Mitchell was also within his discretionary authority as Huntsville Police Officers are permitted to carry hand guns and use them when reasonable under the law.

"Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.   The Supreme Court has established a two-part test to determine the applicability of qualified immunity.  "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).  "If, under the plaintiff's allegations, the defendants would have violated a constitutional right, 'the next, sequential step is to ask whether the right was clearly established.'" *Cottone*, 326 F.3d at 1358; *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001))

For a "right" to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "[I]n the light of pre-existing law the unlawfulness must be apparent." *Id.* As the en banc court explained:

> When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be

29

> materially similar. *See, e.g., Edwards v. Gilbert,* 867 F.2d
> 1271, 1277 (11th Cir.1989). Public officials are not
> obligated to be creative or imaginative in drawing
> analogies from previously decided cases. *Adams v. St.
> Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1575 (11th
> Cir.1992) (Edmondson, J., dissenting), *approved en banc,*
> 998 F.2d 923 (11th Cir.1993).

*Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir. 1997).

(1) P actions constitute a estab viol

(2) If so, 'the next, sequential step is to ask whether the right was clearly established

Accordingly, the burden shifts to Eason to show that Officer Williams is not entitled to qualified immunity.  In April of 1998, when the events involved in the case unfolded, there was clearly established law governing the use of reasonable  force under the Fourth Amendment as well as the parameters by which the Court determines whether force used to effectuate a seizure was a violation fo the suspect's Fourth Amendment rights.   As stated earlier, the Supreme Court has held that excessive force claims should be analyzed under the Fourth Amendment and its reasonableness standard.[24] *Graham,*   490 U.S. at 395. As stated earlier, in this

---

[24] The reasonableness standard articulated in *Graham* has been set forth earlier in this opinion.

particular case, there is a genuine question as to whether such force was in fact justified or whether it amounted to a constitutional violation.  In accordance with the law, the Court must determine whether, in view of the plaintiff's allegation, the conduct would establish a constitutional violation.  The Court concludes that if, as stated in the Complaint, Officer Willianms shot Wallace Mitchell despite the fact that Mitchell did not pose an immediate threat to Officer Willaims or anyone else, Officer William's act of seizing Mitchell using deadly force amounted to a Fourth Amendment violation under the Constitution.

The Court must now determine whether the right was clearly established.  The circumstances of this case do not give rise to a case of first impression for the Eleventh Circuit.  It was and is well established that once a suspect no longer poses an immediate threat to the officer or others, deadly force is no longer reasonable.  By no means was Officer Williams in a situation where he would have to be "creative or imaginative in drawing analogies from previous case law" in order to determine whether his act of shooting a suspect  who is no longer fleeing and who no longer poses a threat violates clearly established law.  Therefore, it is this Court's final determination that according to the evidence presented in viewing that evidence in the light most favorable to Eason, Officer Williams is not entitled to qualified immunity and the motion for summary judgment is hereby due to be **DENIED**.

## Conclusion

For the aforementioned reasons, Officer William's Motion for Summary Judgment is due to be **DENIED** on all grounds.

A separate **ORDER** will be entered.

**DONE** and **ORDERED** this 13th day of June, 2006.


**VIRGINIA EMERSON HOPKINS**
United States District Judge